### WISCONSIN ELECTRIC POWER CO. v. UNITED STATES.

#### Civil Action No. 1680.

District Court, E. D. Wisconsin.

Dec. 31, 1946.

Shaw, Muskat & Paulsen and Van B. Wake, all of Milwaukee, Wis., for plaintiff.

Timothy Cronin, U. S. Atty., and E. J. Koelzer, Asst. U. S. Atty., both of Milwaukee, Wis., and Philip R. Miller and W. B. Waldo, Sp. Assts. to Atty. Gen., for defendant.

DUFFY, District Judge.

This action is brought to recover excise taxes paid on the sale of electrical energy by plaintiff under the provisions of Section 3411 of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 3411. The period involved is from April 1, 1940, to July 1, 1943, during which time plaintiff sold electrical energy to various dairy customers engaged, among other things, in pasteurization of milk and functions normally incident to such pasteurization.

The dairies to which plaintiff sold electrical energy, with one exception, carried on their business substantially as follows: They took orders for the delivery of fresh milk primarily to homes, but to some extent to hotels, restaurants and retail stores; they made contracts with farmers to purchase milk produced on their respective farms; in some instances the farmers delivered the milk to the dairies, but in other instances trucks and drivers furnished by the dairies were used for such hauling purposes; after the milk was received at the dairies, it was unloaded, weighed, tested, pasteurized and then placed in bottles and stored for a short period of time under refrigeration; the dairies later delivered the milk, on definite routes, to individual consumers and regular customers, daily or on alternate days, each dairy maintaining a fleet of trucks and wagons and drivers for this purpose. A few of the dairies did manufacture some cheese and butter, but with the exception of the Pabst Farm, their predominant sale was of fluid milk.

The material portion of the statute in question, prior to the amendment of September 20, 1941, read as follows: "Section 3411(a). There shall be imposed upon electrical energy sold for domestic or commercial consumption and not for resale a tax equivalent to 3 per centum of the price for which so sold, to be paid by the vendor under such rules and regulations as the Commissioner, with the approval of the Secretary, shall prescribe. * * *" The tax was increased to 3⅓ per cent. by the Act of September 20, 1941, Title 26, U.S.C.A. Int.Rev.Code, § 3411(a), which rate became effective on and applicable only with respect to the period after the date of enactment.

In accordance with the interpretation made by the Commissioner of Internal Revenue of the provisions of Section 3411 (a) above quoted, the plaintiff paid taxes on electrical energy it had sold to dairies during the period involved as "electrical energy sold for domestic or commercial consumption." The taxpayer's claim for refund was duly considered by the commissioner and disallowed, and this action was timely commenced.

The question to be here decided is: Are the sales of electrical energy to milk dealers and distributors, who pasteurized their milk as a part of their business, sales for other than commercial consumption within the meaning of Section 3411(a) of the Internal Revenue Code? It is the contention of the commissioner that the milk dealers to which the taxpayer in this case sold the electrical energy were engaged in the commercial business of distributing daily supplies of fresh unspoiled milk from farms to urban homes and places of business, and that the process of pasteurization was but an incident thereto. He reasons, therefore, that such energy was for commercial consumption. The taxpayer contends that pasteurization constitutes a processing of milk, and that a large part of the electrical energy supplied to the dairies is used in such pasteurization; that such is not a commercial use of energy; and therefore

the sale of electrical energy for that use is not a sale for commercial consumption.

Pasteurization of milk is accomplished by means of machinery and equipment specifically designed for that purpose, permitting milk to be raised to a temperature between 143° F. and 145° F. and maintained at such temperature for a period of about 30 minutes and then to be subjected to sudden cooling to a point between 38° F. and 40° F. Precise timing and temperature controls are important and the treatment of the milk requires consecutive coordinated steps. The purpose of pasteurization is to kill pathogenic bacteria in the milk while staying within such tolerances as not to destroy the natural creaming properties of milk nor impart a scorched taste to it.

To permit the proper prompt cooling of the milk, the cooling equipment in pasteurization plants necessarily is of greater capacity than if cooling were to be merely from the temperature of the milk upon its receipt at the plant to a proper holding temperature. Electrical energy is used both directly and indirectly to further the heating and cooling steps in the pasteurization process used in dairy plants. It is used to agitate the milk, to pump milk to and from the pasteurizing vats, to pump hot water, and to pump refrigerants. Uses of electrical energy which indirectly assist in the pasteurization process are electrical consumption for plant lighting, for boiler feed pumps and for the operation of tools and cleaning devices.

For nearly a century the distribution of milk has existed in the United States as a distinct form of business. Pasteurization of milk on a substantial scale was not established in this country until 1897. It came into use in Milwaukee in 1903, and by 1915 it was quite common practice. But even at the present time there are more raw milk plants in the United States than those which pasteurize their milk. In the cities of over 1,000 population in the United States, a majority of the milk dairies distribute unpasteurized milk; more than 25% of all milk sold in such cities is not pasteurized. Two experts testified at the trial they had never heard of a dairy plant which pasteurized and bottled its milk which was not a distributor.

The taxpayer furnished 15 of the 28 dairies with which we are here concerned with more than one electric meter; however, they were not so connected with the load as to differentiate between sales for commercial and non-commercial consumption. In no instance was there a separate metering of electrical energy used by a dairy in its pasteurization process. The dairies' investment in pasteurizing equipment, including increased cooling equipment, is from 15% to 20% of the total cost of its plant equipment, but this percentage figure would be considerably smaller if the investment in such items as trucks and other vehicles, horses, bottles, cases, etc., were taken into consideration. Assuming the sale price of a quart of milk in Milwaukee was 16¢, the cost of the milk itself was 9.6¢, the distribution in bottles about 4¢, and the entire plant operations about 1¢. About $\frac{1}{10}$ of a cent of the cost of plant operations is attributable to pasteurization

While pasteurizing is an important part of the business of the dairies here involved, they likewise utilize systems of rapid regular distribution of fresh milk to their customers, and maintain fleets of trucks, horse-drawn wagons and drivers, garages, loading and unloading facilities, weighing and testing devices, storage and refrigeration rooms, and machinery for putting milk into bottles at high speed.

The government makes no effort to collect a tax on the sale of electrical energy from dairies whose predominant business is the making and selling of butter, cheese, ice cream and similar products. However, the business of the dairies here involved was and is predominantly that of fluid milk dealers and distributors.

█ It seems quite clear that a dairy which does not pasteurize its milk conducts a commercial business. The fact that some dairies do pasteurize their milk does not thereby change the business from commercial to industrial.

A study of the legislative history of Section 3411 of the Internal Revenue Code discloses that those who were sponsoring the

legislation understood it was the nature of the consumer's business which would be controlling and not the specific operation in that business to which the electrical energy might be put. Representative Crisp, one of the conferees, stated on the floor of the House of Representatives, "The conferees finally agreed on a 3% sales tax on commercial and domestic consumers of electrical energy." Senator Harrison, a member of the Senate Finance Committee which favorably reported the bill, in discussing a proposed revision in 1933, said: "I am telling the Senators nothing new when I remind them that we had a fight here in 1932 over the imposition of this tax. The Senate imposed a three per cent electric-energy tax, and it was finally adopted, to be collected from the consumer of electric energy. We applied that only on domestic and commercial energy; that is, electric energy used in stores and dwellings that are classified as commercial and domestic. There was no tax in the 1932 act imposed upon energy employed in industry."

It would unduly prolong this opinion to quote more from the legislative history, but I have examined same. Such discussions are of considerable value in ascertaining the intent of Congress. Helvering v. Griffiths, 318 U.S. 371, 63 S.Ct. 636, 87 L.Ed. 843; United States v. San Francisco, 310 U.S. 16, 60 S.Ct. 749, 84 L.Ed. 1050. I am convinced it was the intent of Congress that the incidence of the tax would not depend upon the particular operation in which the energy was to be used, but upon the nature of the business of which it formed a part. The intention was to tax sales of electricity to commercial businesses, meanwhile exempting sales to industry, and not to require an analysis of the specific functions in which electricity was used in commercial businesses if such uses were incidental to that business.

Since the enactment of the electrical energy tax in the Revenue Act of 1932, § 616, 26 U.S.C.A.Int.Rev.Acts, page 615, the Treasury has construed the provision imposing a tax upon electrical energy for commercial consumption to mean that if the predominant character of the consumer's business is commercial, its consumption of energy is commercial. Article 40 of Treasury Regulations 42 provided: "Where the consumer has all the electrical energy furnished through one meter, the predominant character of the business carried on at such location shall determine the classification of electrical consumption for the purposes of this tax." This provision remained in Regulations 42 through every revision since 1932 and was adopted with only a minor change in Regulations 46 which have been in effect since 1941. During such period various revisions of the revenue laws have been made by Congress, including several affecting the electrical energy tax.

The Treasury has never construed the statute to mean that when electrical energy is sold to a business which is predominantly commercial, it is a sale for other than commercial consumption because some portion of the energy not separately metered is used in said business in a process akin to industrial use.

Plaintiff earnestly contends, however, that until 1941 Regulations 42 contained this phrase: "The term 'electrical energy sold for domestic or commercial consumption' does not include (1) electrical energy sold for industrial consumption, e. g., for use in manufacturing, processing, mining, refining, shipbuilding, building construction, irrigation. * * *" Plaintiff argues that pasteurization is a form of processing. It also sees significance in the fact the word "processing" was eliminated from the regulations in 1941.

It would be a fair method of construction to invoke the rule of ejusdem generis, and consider that the Treasury intended processing as therein used to be limited to certain processing engaged in by the industries of mining, refining, shipbuilding, building construction, irrigation, etc., specifically mentioned. Furthermore, shortly after the promulgation of the regulations, the Treasury issued Ruling ST 637 (XII-I Cum.Bull. 409 (1933)), in which it held that a dairy which obtains milk and converts it into use for retail purposes is engaged in a business of commercial character and that the electrical energy used by it is subject to tax.

It is difficult to understand how the use of electricity in any activity or function could appropriately be called industrial

without any reference to the business of which it is a part. Electrical energy might be used to operate an elevator, or light a building, or operate a pump, but that of itself is not sufficient to characterize the consumption of the energy as other than commercial, or industrial. Such was not the intention of Congress.

The Court of Claims has held that whether a sale of electrical energy is for commercial consumption or industrial consumption must depend upon the predominant nature of the business, and not upon any particular use, at least where the entire operations are woven together and there is no separate metering for each. St. Louis Refrigerating & Cold Storage Co. v. United States, 43 F.Supp. 476, 95 Ct.Cl. 694. Although the taxpayer there manufactured and sold ice, and manufactured, sold and distributed refrigeration through pipe lines, and provided refrigeration for its warehouses located in various parts of the city of St. Louis, the court concluded that the entire business of the company was predominantly commercial rather than industrial, and therefore the electrical energy furnished to it was for commercial consumption.

In United States v. Public Service Co. of Colorado, 10 Cir., 143 F.2d 79, the court reached a conclusion opposite to the decision herein. The argument of the government that the case last above cited may be distinguished from the case at bar, because a stipulation therein stated that the dairies involved were each engaged principally in the business of pasteurizing, has considerable force, as the court did say (p. 80): " * * * the predominant use of electrical energy is in pasteurization of milk or some necessary operation in connection therewith, * * *." However, it seems to me that that court's decision is contrary to the holding herein on the basis of the following statement in the opinion (p. 82): "The electrical energy was not used in the commercial phase of the dairying enterprise, but in the processing or industrial phase of the enterprise."

With due deference to the court announcing the decision in United States v. Public Service Co. of Colorado, supra, I do think

that case was wrongly decided and that judgment herein must go for the defendant, dismissing the complaint to the extent it seeks return of taxes paid on sales of energy to twenty-seven milk dairies.