YARRINGTON *v.* JOHN HANCOCK MUTUAL LIFE
INSURANCE COMPANY.

4-8139                                    201 S. W. 2d 763

Opinion delivered April 14, 1947.

Rehearing denied May 26, 1947.

*Lee Seamster* and *Buzbee, Harrison & Wright,* for
appellant.

*House, Moses & Holmes* and *W. Horace Jewell,* for
appellee.

GRIFFIN SMITH, Chief Justice.    The appeal by Yar-
rington is from a decree dismissing his complaint against
John Hancock Mutual Life Insurance Company and Rob-
ert M. Williams, the plaintiff's allegations being that
Williams as general agent for the Insurance Company
contracted with him July 12, 1943, for the procurement of
applications for retirement participating annuity policies
covering members of the Extension Service, University
of Arkansas College of Agriculture.

The insurance was initially predicated upon a letter
from T. C. Carlson, business manager for the University,
in which he stated that the Board of Trustees had author-

ized a special committee to enter into an agreement with the John Hancock Company, and that the committee on June 9th "voted to approve and adopt the plan submitted by your Company. . . . Under authority of this action of the committee, you may proceed."

This plan as originally drawn provided that contributions in favor of employees of the Extension Service would be made by the University to the extent of five percent of the salary of employees who were eligible to participate, but not in excess of an annual salary of $1,500—such contribution to be from Federal funds administered by the University.

In July 1943 the insurance plan was embodied in a pamphlet termed the Red Book; and in July, 1945, the Blue Book, containing modifications and liberalization of the undertaking, appeared. The Red Book was compiled through joint efforts of the Insurance Company, the University, R. M. Williams, and Yarrington. It carried a facsimile print of President Harding's letter of July 7, 1943, addressed to members of the staff of the Agricultural Extension Service. It is printed in the footnote.[1]

The Red Book was mailed to Extension Service employees. At approximately the same time Williams sent to the listed eligible employees blank application forms to obtain the employee's authorization that the University might deduct from monthly salaries the amount so made available to match the Federal contribution. These applications were mailed by the employees directly to the Extension Service. They were in turn forwarded to Wil-

---

[1] President Harding's letter: "Following a practice adopted by many educational institutions, the University of Arkansas inaugurated several years ago a plan of retirement benefits for members of its faculties and administrative officers. This annuity plan has now been extended to cover the members of the staff of the Agricultural Extension Service. Under the University plan the policyholder makes a monthly payment and the University matches this payment up to a fixed maximum from any funds that have been appropriated for that purpose. It is to be hoped that the protection of this annuity policy may be received in the same spirit of appreciation as it is given and that the spirit of mutual helpfulness may be of great benefit to the University."

liams, who inserted Yarrington's name as the procuring agent or broker. There was no "master" or group policy —only the individual contracts, with the Extension Service named as employer.

Under Yarrington's contract with appellees, which "tied in" with the Red Book, he was to receive as a commission 20% of the first year's premium, and thereafter for nine years 3% per year.

Anticipating that at some time the State would appropriate funds for contributions similar to those made by the Federal government, Article 14, Sec's 3 and 4, provided: "Since State appropriated funds cannot be used as employer contributions, . . . amendment to [the general provisions of Article 14] will be made to remove the $1,500 limitation if and when authority is provided for the use of State appropriated funds as employer contributions."

Yarrington was paid all he claims was due him for policies issued in 1943 and 1944, and neither Williams nor the Company contends that he will not be entitled to commissions on premiums paid during the full period—that is, three percent annually for nine years.

In 1945 the General Assembly, by Act 83, approved February 21, authorized use of State funds as contributions, to be matched by employees of the Extension Service, such contributions not to exceed five percent of the employee's salary. The $1,500 limitation was not included in the Act; whereupon the Blue Book was issued. Like the Red Book, it carried facsimile of President Harding's letter of July 1, with this statement: "A recent appropriation by the General Assembly makes it possible for members [of the staff of the Agricultural Extension Service] to participate [in the annuity insurance] no matter whether they are paid by State funds or by Federal funds. Under the University plan the policyholder makes a monthly payment and the University matches this payment."

Yarrington construed his contract with Williams and the Insurance Company to be that when State funds became available for contribution purposes, to be used in a manner similar to use of Federal funds, the general plan of insurance was merely enlarged, and that he is entitled to commissions on the business originating subsequent to the Blue Book, and upon increased or enlarged policies in effect July 1, 1945, where the increase came about by reason of Act 83, and by removal of the $1,500 limitation.

While conceding that he did not contribute to preparation of the Blue Book, Yarrington testified that he collaborated with the Extension Service faculty in getting information regarding annuity contracts. The Extension Service was at that time headed by Dean Dan T. Gray, who said to appellant: "Yarrington, we are interested in a retirement annuity for Extension Service employees. They ought to be interested in the best contract that can be written, and I wish you would see what you can do."

Yarrington was agent at Fayetteville for Guardian Life Insurance Company, but it did not write annuities. This conversation occurred early in the fall or late summer of 1940. Thereupon Yarrington took the matter up with Bob Williams, and Williams in turn referred the subject to John Hancock Company. E. H. Thompson was head of the Extension Service at Little Rock. The information collected by Yarrington, Williams, and others who assisted, was sent to Thompson, but for some reason the policies could not be written at that time. Thompson was replaced by Aubrey Gates. In 1942 Yarrington wrote Gates, asking that the information he had supplied Thompson be returned for further consideration. In this connection Yarrington had direct correspondence with the Hancock Company. The Company responded July 14, 1942, stating that it regretted its inability to accept the business at that time because underwriting restrictions would not enable "the case to qualify." The letter closed with this statement: ". . . Our only hope would be that the employer do not take action until after

we have had an opportunity to modify our present underwriting restrictions. It is conceivable this may be done in the fall, but I am dubious that such modification will take place before then.'' The modification mentioned in this later was made, and the Company accepted the business.

During the session of the 1945 General Assembly, Williams and Yarrington worked together, and with the Extension Service, to procure State appropriations. Williams and Yarrington, according to appellant's testimony, considered that if an appropriation should be made the new business would be a continuation of Red Book plans. February 2, 1945, Williams wrote Yarrington as follows: ''I have your letter of the 31st, and will certainly do the necessary in connection with the Milum Bill when it comes up in the House. You needn't worry about that business going elsewhere, as we sewed it up when we entered into contract with the University, as you know. Keep the eagle eye on the situation; and if anything happens, we will get together.''

March 1, 1945, Williams wrote W. H. Chatfield, manager of the Salary Savings and Pension Trust Division of the John Hancock Company (Boston). He expressed delight that the Legislature had made statutory provision for state contributions, and added: ''We are at work with the local office toward assembling additional data, with a view of making these additions as of July 1, 1945.'' He then stated that much to his surprise Sam Watkins, agent of another insurance company who appeared to speak with authority, had told him (Williams) that the University desired that commissions, formerly received by Yarrington, should go to Watkins—who, it appears, was threatening to have the business taken from John Hancock and placed with another company unless the commission arrangements should be changed. Williams stated that he was under the impression that ''we'' had a contract with the University covering the business—and, inferentially, the business was a continuation of the old. He asked that photostatic copy of the contract be

sent him. There was this significant statement: "My feeling in the matter is that we are duty bound to the original agent, C. C. Yarrington, and I do not see how we could go around him. We were named the insurer to begin with; and, off-hand, I do not see how the Board of Trustees could give the business to anyone else but the John Hancock unless they construe it in the light of an entirely new contract."

March 5, 1945, Williams wrote Yarrington, stating that he had talked with one of the University Trustees, "who feels as we do, that the contract was awarded the John Hancock Company for the retirement annuity plan to cover the employees of the Extension Service. It was not awarded just on the basis of taking care of the Federal fund angle, but was so set up to take care of that feature immediately, and hook in with the State angle when the Legislature made the necessary appropriation." There was reference to pressure that might be exerted, with identification of those whom he thought could be of service. He was convinced that these parties, "once they saw the light, will have a change of heart." The concluding sentence was: "Just stay in there and pitch until the very last minute; then, if we see there is no other way in the world but to work out a deal [with Watkins], you and he can get together and try to come to some satisfactory conclusion."

Williams wrote another letter, in which he referred to Act 83, and in part said: "There seems to be considerable misinformation about the status of an existing contract between our Company and the University of Arkansas. . . . Back in 1942 the John Hancock Company was awarded the retirement annuity plan [covering Extension Service employees], and in the Legislature of 1943 we attempted to get the same bill passed which has just been enacted. The Board of Trustees gave our Company the specifications for the plan, and after some six months of negotiations the details were satisfactorily worked out. One of the main details was the manner in which additions to the plan would be handled when and if the State Legislature passed an Act to take care [of

contributions]. Under these pension plans the specifications are rather complicated and it would not only be impractical, but almost impossible, for another Company to write a plan to take care of these additions which would dovetail in with the present plan." There was much more in the letter emphasizing Williams' belief that the contract "we had entered into" was valid, that the business was created in good faith, and in effect that it was generally understood that if the State acted, then the newly available funds would be in the nature of a supplement to the business then resting upon Federal money.

Other letters and conversations—not denied by Williams—conclusively establish the proposition that he dealt with Yarrington on the basis of a general agent authorized by his Company to hold out the inducement that a valid contract had been entered into by himself and the Company upon the one hand, and the University Board of Trustees on the other, to write the policies. Williams' letter to the home office stresses this belief; and certainly Williams caused Yarrington to think that valid contractual relationships were a fact. Acting upon these assurances, Yarrington became a motivating agency for procurement of the policies, beginning in 1943 and continuing through June 30, 1945.

Williams did not, in his testimony, seek to conceal his belief that Yarrington was entitled to the business. He testified very frankly regarding conversations, gave Yarrington credit for working up the plan, and explained that the University contract "was not awarded just on the basis of taking care of the Federal fund angle"; but, as he insistently declared, "it was set up to take care of the [Federal feature *immediately*], and to hook in with the State [appropriation] when the Legislature had acted."

In writing the home office Williams told Chatfield they were "duty bound to the original agent, Yarrington, and I do not see how we could go around him." Williams talked with one of the University Trustees, who felt the same way. And he said to Yarrington, "You needn't

worry about the business going elsewhere. We sewed it up when we entered into contract with the University."

It is argued that, when the extended or enlarged service matured, the University designated the agent who should receive commissions; hence appellees were powerless to interfere. But, as a matter of fact, the University Board did not name Watkins. There were letters and conferences and conversations between Williams, individual Trustees, and others who were interested because of personal relationships; but the University did not, by resolution or other official act, bestow any of the business upon Watkins. Williams himself made the designation—and he did this at a time when his best judgment was that Yarrington was entitled to the commissions. Finally he abandoned Yarrington when attorneys told him that use of the State fund and elimination of the $1,500 limitation should be construed as a new undertaking. When asked regarding indirect instructions he thought he had received to "cut" Watkins in as broker —that is, when asked whether the directions were official or unofficial, Williams replied:

"No, [they were not official]. But when you find out what's going on, it's very helpful. When you know what's going on, and somebody who is sitting there is helping out, then you would feel more at liberty to say it had come by word of mouth, rather than by anybody coming out and telling it to you. I thought it was being made pretty plain:—*they* were told, and they told me." And again: "You, instead of the Board of Trustees, designated Mr. Watkins, didn't you?" Answer: "Oh, if you want to get it down to a needle-point, yes!"

In their brief appellees construe the right they contend for by saying it became evident the John Hancock Company would not retain the business unless Watkins should be permitted to receive the commissions. Therefore, in order to hold a profitable contract (and it was a contract Williams says *was not new*),—in order to retain this business Williams acquiesced in the unofficial representations he was persuaded to believe had come from an authoritative source; and in doing so he severed his

relationship with Yarrington as to policies issued subsequent to June 30, 1945, and as to increases in outstanding policies; and on May 26th he consummated arrangements with Watkins. This he could do insofar as Watkins was concerned, and Yarrington may look only to appellees for compensation.

Appellees say in their brief that "The sole interest of the University in the policies was its agreement to contribute from funds provided by the Federal government"; for, as was said in a preceding sentence, "No contract was made with the University of Arkansas. Each employee made a separate application to the Company for an annuity, in an amount determined by him, and by him alone." Yet, under the same contract, arrangement, understanding, or set-up, the 1945 applications, according to appellees, "were mailed to the employees by Watkins, and he signed his name to the application as procuring agent. . . . He was the broker—not only by virtue of appointment by State officials and the Board of Trustees of the University of Arkansas, but he was also the broker who in fact solicited and procured the applications for each annuity in 1945." Finally it was said that if Yarrington was prevented from soliciting applications, "It was by the Board of Trustees, and not by Williams."

It must be remembered that Williams conceded that he, and not the Board of Trustees, appointed Watkins. It is true, of course, that Williams says the pressure was too great to be resisted; but, in failing to meet the issue at the risk of losing his own business, he assumed whatever liability attached to this choice of action, even though the choice was not one he relished.

The real root contract was made when Carlson wrote Williams in 1943 that the Hancock Company had been selected, that its plan had been approved, and that "Under authority of [this selection by the special committee] you may proceed." Williams and the Company did proceed, and they contracted with Yarrington. The University Board of Trustees (June 11, 1945) passed a resolution providing for expansion of the annuity plan,

and in the resolution said: "Be it resolved that the John Hancock Mutual Life Insurance Company of Boston *be continued* as the underwriting institution."

The contract between Williams and Yarrington (July 12, 1943) was indorsed by the John Hancock Company and signed, "J. H. Ward, Second Vice-President." Williams subscribed as general agent. A contractual provision was that the agreement might be terminated upon thirty days written notice, "but such termination alone shall not impair the broker's right to receive [commissions] if any shall accrue on policies issued on applications procured prior to such termination." Notice of termination must be served personally, or sent by registered mail.

No such notice was given Yarrington. His suit was filed November 20, 1945. He prayed for an accounting, payment of all sums due, and for a decree of specific performance.

The John Hancock Company demurred December 10, 1945, asserting that the complaint failed to affirmatively show a contract to which it was a party. The complaint was amended March 13, 1946, by alleging the joint liability of Williams and his Company. There was a motion to require the plaintiff to make his complaint more definite and certain; and there were other pleadings. Williams' answer was filed May 27, 1946. It contained a definite disclaimer of liability; and it was, we think, sufficient notice to Yarrington that he would no longer be dealt with as a broker in respect of the annuity contracts.

It is a general rule of construction, applicable to ambiguous contracts, that where the parties have acted in a definite way, and have by such conduct said, in effect, that a particular purpose was contemplated from the very beginning, then courts will give great weight to what the accepted meaning was. *Powell* v. *Baker Ice Machinery Co.*, 8 Fed. 2d 125; *Sternberg* v. *Drainage District No. 17 of Mississippi County, Ark.*, 44 Fed. 2d 560; *Kahn* v. *Metz*, 88 Ark. 363, 114 S. W. 911, and other similar deci-

484

sions. See "Contracts," West's Arkansas Digest, Fifth Volume, § 170.

It would be difficult to find a clearer case of construction by the parties than the one we are called upon to adjudicate in the appeal before us. The complete frankness of Mr. Williams leaves little to be supplied by inference. He and his Company contracted with Yarrington, and it was intended that when the State appropriation became effective the 1943 arrangement would continue and the supplemental business merged into it. The University's resolution of June 11, 1945, shows the influence of this contract:—"the John Hancock Company *shall be continued as the underwriting institution.*"

The decree is reversed with directions that an accounting be had, and that Yarrington have judgment for the commissions he is entitled to on business resulting until May 27, 1946, the date of Williams' answer.