# WISCONSIN ELECTRIC POWER CO. *v.* UNITED STATES.

No. 237.   Argued January 7, 1949.—Decided February 14, 1949.

*Van B. Wake* argued the cause and filed a brief for petitioner.

By special leave of Court, *William L. Ransom* argued the cause for the Consolidated Edison Company of New York, as *amicus curiae,* in support of petitioner. With him on the brief were *James K. Polk* and *Laurence W. Fairfax.*

*Lee A. Jackson* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Caudle* and *Ellis N. Slack.*

MR. JUSTICE REED delivered the opinion of the Court.

Petitioner, engaged in the business of supplying electric energy to the public, seeks the refund of taxes paid by it pursuant to § 3411 of the Internal Revenue Code. That section, in pertinent part, provides for a tax

". . . upon electrical energy sold for domestic or commercial consumption . . . equivalent to 3 per centum [1] of the price for which so sold, to be paid by the vendor under such rules and regulations as the Commissioner, with the approval of the Secretary, shall prescribe." [2]

Note that the statute taxes energy for domestic or commercial consumption. There is no provision for taxation of electrical energy used for industrial purposes.[3]

The purchasers of the electric power here involved are 27 dairy plants which are engaged primarily in the collection, pasteurization, and distribution of fresh milk. The sole question presented by the case is whether the use of electricity by these dairies is commercial con-

---

[1] Amended by the Revenue Act of 1941, c. 412, 55 Stat. 687, 707, § 521 (a) (19), to change the three percent tax to three and one-third percent.

[2] 26 U. S. C. § 3411.

[3] See, *infra,* p. 180, *et seq.*

178

sumption within the meaning of the statute or industrial consumption, a use not covered by the statute.

The functions of the dairy plants are sufficiently similar so that they can be treated as one for the purpose of describing their methods of operation. The plants are buildings equipped with milk-handling machinery and facilities located either off the dairy farms, or on the dairy farm itself as an activity apart from milk production. Contracts for the purchase of raw milk are negotiated with nearby farms.[4] This milk is delivered in trucks of the producers or of the dairy plant, as the case may be, to the plant where it is received, weighed, tested for butterfat content, cooled, and mixed and standardized so as to achieve the proper butterfat content. Next it is pasteurized. Pasteurization consists of heating the milk to 143°–145° F., maintaining it at that level for about thirty minutes, and then subjecting it to sudden cooling to a point between 38° and 40° F.[5] The process is designed to kill pathogenic bacteria without destroying the natural creaming properties or the taste of the milk. Then the milk is drawn into bottles or cans which have been washed, sterilized, and cooled. Finally it is stored in refrigerated rooms to permit the cream line to form and to await delivery.[6] Most of it is delivered to customers in the dairy plant's trucks or wagons. In some instances a small proportion is sold at the plant itself.

---

[4] A few of the consumers of electricity here involved produce their own milk.

[5] One of the plants pasteurizes by the so-called "flash method," heating the milk to 161° F. for 16 seconds and rapidly cooling it to 32° F.

[6] A minor proportion of the milk purchased by these plants is manufactured into butter, cheese, or other by-products. An undisclosed amount of this milk is separated from the cream it contains; some is also homogenized.

Electric power is employed by the purchasing dairy plants in a number of ways. It is used to light the plants, including the garage space for the collecting and distributing trucks. It drives electric motors which pump refrigerants, deliver milk to and from the pasteurizer and to the bottling machines, operate the homogenizer, the bottling machine, the cream separator, and the machinery used in washing, sterilizing and conveying bottles. The electricity used by some of the plants is measured through a single meter, that of others through two or more meters, but in no case are the meters so connected to the incoming power line as to enable the energy supplied for one purpose to be differentiated from that supplied for another. We do not have before us a situation where pasteurization utilizes electrical energy that is measured by a meter exclusively used for pasteurization.

Pasteurization is accomplished by the use of special equipment designed for that purpose. Most of the electricity attributable to the process is devoted to the ice machines which perform the rapid cooling of the milk after the initial heating. Since the same cooling units perform the cooling which is necessary before and after pasteurization, however, the electricity which they consume for pasteurization alone cannot be ascertained. Pasteurization equipment, including the increased cooling equipment necessary therefor, accounts for about 15 or 20 percent of the total cost of plant equipment, excluding trucks and other vehicles. About one-tenth of the cost of plant operation, excluding the cost of the raw milk and costs attributable to distribution, is attributable to pasteurization.

Petitioner paid the tax on electrical energy sold to the dairy plants during the period from April, 1940, to July, 1943, and then brought suit to recover it on the ground that such energy was sold not for commercial but for

industrial consumption. The United States District Court for the Eastern District of Wisconsin held that the sales were for commercial consumption within the meaning of the statute, and therefore that the tax was valid. 69 F. Supp. 743. The United States Court of Appeals for the Seventh Circuit affirmed. 168 F. 2d 285. It summarized its views as follows:

> "We agree with [District] Judge Duffy that the wording and legislative history of the Act make it clear that the predominant character of the business carried on by a consumer of electrical energy is what determines whether the electricity sold has been sold for 'commercial consumption'; hence we are content to adopt his opinion as that of this court." *Id.* at 286.

The United States Court of Appeals for the Tenth Circuit had held in *United States* v. *Public Service Co. of Colorado,* 143 F. 2d 79, that electrical energy sold to dairy plants operating substantially as these was sold for industrial rather than commercial consumption, and consequently was not taxable under § 3411. We granted certiorari in this case in order to resolve the apparent conflict between circuits and to settle the meaning of the statute as it applies to the business of this general type of dairy plant. 335 U. S. 842.

The tax now embodied in § 3411 was originally imposed upon the consumer of electricity by the Revenue Act of 1932, 47 Stat. 169, 266. This Act was amended in 1933 to make the burden of the tax fall directly upon the vendor. 48 Stat. 254, 256. No change of any significance for our purposes has occurred since the original enactment of this provision.

Although the language of the section does not include the word "industrial," it is clear from the legislative history that "commercial" was used in contradistinction to

"industrial." [7]   While electricity sold for commercial consumption is taxed, that sold for industrial consumption is not.   Thus our task resolves itself to a determination of the category in which the consumption of electricity by these dairy plants should be classified.   We shall not undertake the difficult and here needless task of general definition which differentiates for this statutory clause between industrial and commercial in other lines of business activity.   That is a problem primarily for the administrators of the section, with knowledge of the specific and varying facts.

The legislative history indicates that the term "commercial" was meant to apply to the nature of the business in which the energy is consumed, and not to the specific purpose to which each measurable unit of electricity is devoted.[8]   Where it is delivered through a single meter at one location, energy utilized to operate sewing ma-

---

[7] H. R. Conference Rep. No. 1492, 72d Cong., 1st Sess., p. 22; Senator Harrison, 77 Cong. Rec. 3212–14, 3215.

[8] The legislative explanations treat of business consumers as units and do not differentiate as to use within the units.

Senator Harrison, Chairman of the Senate Finance Committee, which reported the bill, said:

"I am telling Senators nothing new when I remind them that we had a fight here in 1932 over the imposition of this tax.   The Senate imposed a 3-percent electric-energy tax, and it was finally adopted, to be collected from the consumer of electric energy.   We applied that only on domestic and commercial energy; that is, electric energy used in stores and dwellings that are classified as commercial and domestic.   There was no tax in the 1932 act imposed upon energy employed in industry."   77 Cong. Rec. 3212–13.

Senator Couzens, a member of a subcommittee of the Senate Finance Committee, which was constituted to consider the electrical energy tax, said: "I mean they eliminated that feature of the tax; they eliminated the tax on electrical energy sold to manufacturing plants and left the tax on electricity used commercially, that is by stores and on electricity used for domestic purposes . . . ."   77 Cong. Rec. 3218.

chines for a minor manufacturing unit, *e. g.,* shirts, in a department store, would be deemed power sold for commercial consumption, although it might fall within the industrial category if sold to a consumer who did nothing but manufacture shirts. Since any other interpretation of the section would entail the almost insurmountable administrative difficulty of classifying all the electricity sold to a plant according to the specific operations to which such power was devoted by the consumer, the conclusion that the controlling factor is the general nature of a business at a location accords with the natural meaning to be given the words employed by Congress to express its purpose.

The regulations interpret the section in line with the legislative history. U. S. Treas. Reg. 46 (1940 ed.) § 316.190 [as amended by T. D. 5099], presently applicable, provides in pertinent part:

> *"Scope of tax.*—The tax imposed by section 3411 (a) of the Internal Revenue Code, as amended, applies, except as provided hereinafter, to all electrical energy sold for domestic or commercial consumption and not for resale.
>
> "The term 'electrical energy sold for domestic or commercial consumption' does not include (1) electrical energy sold for industrial consumption, e. g., for use in manufacturing, mining, refining, shipbuilding, building construction, irrigation, etc., or (2) that sold for other uses which likewise can not be classed as domestic or commercial, such as the electrical energy used by electric and gas companies, waterworks, telegraph, telephone, and radio communication companies, railroads, other similar common carriers, educational institutions not operated for private profit, churches, and charitable institutions in their operations as such. However, electrical energy is subject

to tax if sold for consumption in commercial phases of industrial or other businesses, such as in office buildings, sales and display rooms, retail stores, etc., or in domestic phases, such as in dormitories or living quarters maintained by educational institutions, churches, charitable institutions, or others.

"Where electrical energy is sold to a consumer for two or more purposes, through separate meters, the specific use for which the energy is sold through each meter, i. e., whether for domestic or commercial consumption, or for other use, shall determine its taxable status. Where the consumer has all the electrical energy consumed at a given location furnished through one meter, the predominant character of the business carried on at such location shall determine the classification of consumption for the purposes of this tax." [9]

The last sentence of this regulation makes it clear that all electrical energy furnished to a predominantly commercial establishment through a single meter is subject to the tax although portions of such energy are devoted to purposes which, considered separately, might be classified as industrial.[10] While the regulation does not deal with the point, we think it obvious from the last quoted paragraph that where the energy is furnished at a single location through various meters, although none of them

[9] This regulation was substantially the same in its earlier versions. U. S. Treas. Reg. 42, Art. 40 (1932); T. D. 4342, XI–2 Cum. Bull. 495 (1932); T. D. 4393, XII–2 Cum. Bull. 322 (1933). The quoted version, however, omitted the word "processing," which was formerly included in the list of activities exemplifying industrial consumption. We do not consider this deletion significant for purposes of this case.

[10] Cf. *St. Louis Refrigerating & Cold Storage Co.* v. *United States,* 95 Ct. Cl. 694, 43 F. Supp. 476; *Fulton Market Cold Storage Co.* v. *United States,* 95 Ct. Cl. 710, 43 F. Supp. 485.

are shown to carry current for predominantly industrial uses, the same rule would be applied. The last sentence of the regulation adds a qualification, however, which directs our attention, not necessarily to the nature of a business as a whole, but to the nature as a whole of the activities carried on "at a given location."

We accept the last sentence of the quoted regulation as proper under the statute.[11] As applied to these plants we think that the electricity furnished by the petitioner was "sold for commercial consumption" and consequently was properly taxed. Admittedly the activities of these consumers would be considered commercial if they did not pasteurize the milk prior to its sale. Such business would accurately be called the distribution of fresh milk. The butter and cream extraction appears incidental. We are not dealing with a "creamery" in the sense of a butter or cheese factory. We agree with the courts below that the addition of pasteurization to the other activities described above does not change the nature of the dairy plants' business from commercial to industrial any more than would the cooking of food for sale in a restaurant, or the cleaning of raw food products prior to distribution or sale. The District Court found that "pasteurization plays a minor part in the total business of the dairies," and that "the predominant business of the dairies here involved . . . is, and was, that of fluid milk dealers and distributors." [12]

---

[11] We do not intend by these words of limitation to approve or disapprove other provisions. There are ambiguities in this section of the regulation. In the second paragraph, without reference to separate meters, it holds that energy used in the commercial phases of an industrial business is taxable. The reverse would seem to follow as to industrial phases of a commercial business. Yet the third paragraph allows the avoidance of such a tax on industrial use only by the employment of separate meters.

[12] For state cases to the effect that this business is primarily commerical, see *e. g. City of Louisville* v. *Ewing Von-Allmen D. Co.*, 268

Petitioner argues that the test applied by the Court of Appeals, "whether the predominant character of the enterprise carried on by such consumer is commercial," is erroneous and contrary to the regulation in that it directs attention to the business as a whole rather than to the activities at a given location. While the language quoted is susceptible to this criticism, the variation is harmless because the plant itself is the location or the focal point of all the relevant activities of each of these consumers of electricity. Pasteurization does not occur at a separate location, but at the same plant where the milk is received, weighed, tested, cooled, homogenized, separated and bottled. The milk is brought to this plant when purchased, and from the plant it is distributed to customers. The fact that most of the sales or deliveries occur off the premises does not alter the essential fact that all activities occur in or pivot around the plant.

Thus, though pasteurizing, we assume, is processing and though processing separately viewed may be conceded to be industrial,[13] we conclude that the business conducted by these dairy plants is essentially commercial. The contrary conclusion reached in *United States* v. *Public Service Co. of Colorado,* 143 F. 2d 79, may be ascribed to the fact that there the court apparently looked to the use to which the electrical energy was devoted rather than to the nature of the business at a given location.[14]

---

Ky. 652, 105 S. W. 2d 801; *People ex rel. E. S. Dairy Co.* v. *Sohmer,* 218 N. Y. 199, 112 N. E. 755; *Richmond* v. *Dairy Co.,* 156 Va. 63, 157 S. E. 728. But see *Dairy Assn.* v. *Bd. of Tax Admin.,* 302 Mich. 643, 5 N. W. 2d 516.

[13] See note 9, *supra.*

[14] "The electrical energy was not used in the commercial phase of the dairying enterprise, but in the processing or industrial phase of the enterprise." 143 F. 2d 79, 82.

Rulings of the Bureau of Internal Revenue support our conclusion. In 1932, S. T. 518 stated that,

"Electrical energy furnished for consumption by bottling works, milk companies, or creameries engaged in the pasteurization and bottling of milk, and in the manufacture of butter, buttermilk, chocolate milk, and cottage cheese, is not furnished for domestic or commercial consumption . . . ." [15]

Apparently, however, the Bureau intended this ruling to apply only to those plants whose business was predominantly pasteurization and the manufacture of milk by-products, because S. T. 637, issued the following year, contained the following statement:

"A dairy which obtains milk and converts it into use for retail purposes is held to be engaged in a business commercial in character. Electrical energy used in such operations will be subject to tax." [16]

In clarification of these two rulings the Bureau explained:

"Electrical energy furnished a commercial dairy or milk company which merely produces or purchases raw milk in bulk and pasteurizes it for sale either in bulk or bottled quantities, whose activities consist principally in the handling, distribution and sale of milk, is also subject to the tax.

"It is only electrical energy that is furnished for direct consumption by dairies which in addition to pasteurizing and bottling milk are also engaged in all the essential manufacturing processes necessary for the production of dairy products, such as the

---

[15] XI-2 Cum. Bull. 498 (1932).
[16] XII-1 Cum. Bull. 409, 410 (1933).

manufacturing of butter, cheese and other dairy products, for sale on the open market as an article of commerce, that is not subject to the tax." [17]

Thus we hold that electrical energy supplied to these dairy plants through single meters, or through more than one but without differentiation as to use, is energy sold for commercial consumption.

*Affirmed.*

---

[17] Bureau Letter, dated May 13, 1933 (symbols MT: ST: BHF) (333 C. C. H. ¶ 6266), 4 C. C. H. Standard Federal Tax Reporter ¶ 2633G .175 (1949).