426 P.2d 231

**UNION PACIFIC RAILROAD COMPANY,**
a corporation, Plaintiff,

v.

**STATE TAX COMMISSION of Utah,**
Defendant.

No. 10710.

Supreme Court of Utah.

March 13, 1967.

Dissenting Opinions May 1, 1967.

———◆———

Bryan P. Leverich, A. U. Miner, Howard F. Coray, Scott M. Matheson and Norman W. Kettner, Salt Lake City, for plaintiff.

Phil L. Hansen, Atty. Gen., Henry L. Adams, Asst. Atty. Gen., Salt Lake City, for defendant.

ELLETT, Justice.

This case involves the question of whether a railroad in interstate commerce is a commercial or an industrial enterprise. If it be industrial, it escapes retail sales taxes and use taxes on fuel oil which it buys and uses to propel its engines.

Our statute exempts from the taxes the sale of coal, fuel oil, etc., except those sold or furnished for *domestic* or *commercial* consumption. (Emphasis added.) (Section 59–15–4[a] and [b], U.C.A.1953, as amended.)

The plaintiff argues that since Utah copied its law in substance from the Federal Government (Section 616[a]) originally enacted as a part of the Revenue Act of June, 1932, the debates in Congress would throw light upon the interpretation which we should now give to the Utah statute. The following quotation is from 50 Am.Jur., Statutes, Section 459:

The presumption and general rule that the adoption of a foreign statute carries with it the prior construction in the originating state is regarded as of special force, and strong, persuasive, and entitled to great weight and respectful consideration, so that only strong reasons will warrant a departure from it. It is, however, by no means absolute, mandatory, or controlling or imperative on the courts of the adopting state, which do not follow the decisions of the foreign jurisdiction blindly. The general rule is subject to numerous well-defined limitations and exceptions. In the first place, it is applicable only where the terms of the statute are of doubtful import, so as to require construction; the rule will not be followed where the language of the statute is plain and free from ambiguity so that there is no room for interpretation.

The borrowing state only takes into consideration the construction placed upon the statute by the court of last resort. (See Norville v. State Tax Commission, 98 Utah 170 at page 177, 97 P.2d 937, 126 A.L.R. 1318.) It would not be influenced by debates which might or might not influence the courts of the state from which the law was borrowed in giving meaning to an ambiguous statute. We would be interested in what was said by sponsors of and committees which urged the passage of a bill in our own legislature in determining the legislative intent but then only if the meaning was not clearly ascertainable.

The plaintiff makes another argument to which we direct our attention. It says that for 22 years the defendant Tax Commission has interpreted the statute so as to exempt railroads from paying a sales or use tax on its fuel oil used in propelling its engines and that many legislatures have been convened during that period of time, but never once has a bill been introduced to change the statute as so interpreted. The general law is found in 82 C.J.S. Statutes § 358, at page 759:

On the principle of contemporaneous exposition, common usage and practice under the statute, or a course of conduct indicating a particular understanding of it, will frequently be of great value in determining its real meaning, especially where the usage has been acquiesced in by all parties concerned, and has extended over a long period of time. A practical construction of a statute is not conclusive on the courts, but, if unvarying for a long period of time, it should be disregarded only for the most cogent reasons. The doctrine arises only from a course of conduct, and is never applied to a single case. Moreover, no matter how long the usage has been established, or how general the acquiescence in the customary construction, it will not be permitted to override the plain meaning of a statute; nor will the rule of prac-

tical construction apply where the ambiguity is merely captious and not serious enough to raise a reasonable doubt in a fair mind deflecting honestly on the subject.

■ This latter question was before the Arkansas Supreme Court in the case of Arkansas Inspection & Rating Bureau v. Insurance Co. of North America et al., 218 Ark. 830, 238 S.W.2d 929. There it was said at page 934:

Appellant insists that when the Commissioner notified North America that it should refile, and North America acquiesced, the parties thereby construed the requisite procedure, hence they cannot now be heard to plead otherwise. It is also insisted that the courts are bound by such inter-party construction, citing Yarrington v. John Hancock Mutual Life Insurance Company, 211 Ark. 474, 201 S.W.2d 763. But in the Yarrington case a contract (as distinguished from a statute) was involved. Courts are not required to adopt the construction interested persons have placed on a legislative Act, although where the language is doubtful and a subdivision of the state is involved, high regard will be accorded a construction accepted over a substantial period of time.

■ In fact, our own Supreme Court dealt with this same argument in the case of Olson Construction Company et al. v. State Tax Commission of Utah, 12 Utah 2d 42, 361 P.2d 1112, in the following language:

Nor does the quoted provision of Sales Tax Regulation No. 58 aid the plaintiffs. The Commission has since deleted this provision from its regulations and now contends, with some embarrassment, that it had no legal basis and was contrary to law. We agree with this contention. The regulation went beyond permissible limits of administrative interpretation since it would, on the facts of this case, nullify the applicable statutory definitions of the terms "retail sale" and "retailer" and would grant an exemption where the statutes grant none. This court, while recognizing the possibility that one might be penalized by reliance upon an invalid administrative regulation, has held that an administrative interpretation out of harmony and contrary to the express provisions of a statute cannot be given weight and, to do so, would in effect amend that statute.

■ We do not think there is any ambiguity in the statute involved herein. Fuel oil and coal are taxed only if sold or furnished for domestic or commercial consumption. We would not expect the legislature to predetermine whether or not any given concern was engaged in domestic or commercial activity. That is a factual question to be initially determined by the

Tax Commission and ultimately by this court.

If the legislature were required to determine whether or not the tax should be imposed upon a railroad, it likewise would be required to determine whether it should be imposed upon an electric light company which burned coal to produce electricity. It should also specify whether a farmers' co-op which processed agricultural products would be engaged in industrial activity; and regardless of how many enterprises the statute would attempt to specifically include or exclude from the tax, the ingenuity of man could always devise an unthought of enterprise which the court would ultimately have to consider. It is not any ambiguity in the law which gives the occasion for this lawsuit, but it is the application of the facts to the law which brings this matter to the court's attention.

■ Since we do not find the statute to be ambiguous or uncertain, we have no reason to consider even the holdings of the United States Supreme Court, if any there be, as it might have interpreted the borrowed statute. It would follow that the holding of administrative federal agencies and congressional debates regarding Section 616(a) would not be of any assistance whatsoever to us in this matter.

■ There remains only the factual aspect of this case: Is a railroad engaged in an industrial business rather than in a domestic or commercial activity? The New Twentieth Century Dictionary Unabridged defines "industrial" as follows: "Pertaining to, involving, or characterized by industry; pertaining to those manufacturing or other operations through which marketable commodities are produced; as, industrial arts; industrial operations. * * *"

The same authority defines "commercial" as follows: "(1) Pertaining to commerce or trade; as, commercial affairs; commercial relations. * * * (2) Carrying on commerce; as, a commercial nation. * * * (3) Proceeding from trade; as, commercial benefits or profits. * *"

North Whittier Heights Citrus Ass'n v. National Labor Relations Board, 9 Cir., 109 F.2d 76, was a case wherein a corporation operated a plant in which it washed, graded, assembled, packed and shipped citrus fruits for its stockholders. In a labor dispute, it was claimed that the employees of the plaintiff were engaged in agricultural rather than industrial activity. The court said at page 80:

Industrial activity commonly means the treatment or processing of raw products in factories. When the product of the soil leaves the farmer, as such, and enters a factory for processing and marketing it has entered upon the status of "industry".

■ In fact, a subsidiary of the plaintiff in this case claimed to be engaged in

industrial activity and called upon this court to so determine in the case of Ogden Union Railway and Depot Company v. State Tax Commission of Utah, 16 Utah 2d 255, 399 P.2d 145. The question there was as to whether the plaintiff must pay sales and use taxes on coal used for the direct operation of revenue equipment belonging to its parent companies, to-wit, the Union Pacific Railroad Company and the Southern Pacific Company. At page 257 of the Utah Reports, 399 P.2d at page 147 this court said:

> The pivotal question then is whether the plaintiff uses coal for a "commercial" use, as found by the Commission, or for an "industrial" use, as contended by the plaintiff. The differentiation between these uses involves niceties in the determination and application of facts which the administrative body, because of its advantaged position and of its expertise in the field is better equipped to deal with than is this court. (Citation omitted.) And because of these factors, its decision should be indulged some credit and not disturbed lightly. (Citation omitted.)

A careful consideration of the entire sales tax statute, Sec. 59–15–4, U.C.A. 1953, tends to support the Commission's conclusion. The same statute which provides for the tax on coal sold or furnished for "commercial" consumption (Sec. 59–15–4(b) (2)) by its other sub-

divisions, (b), (d), (e), (f), and (g) also expressly taxes a wide gamut of other services such as transportation, amusements, hotels, motels, cafes and laundries, all of which are properly classified as "commercial" and includes with them "common carrier" operations.

In its broadest meaning "commercial" would include all business activity, and such a construction would tax all business enterprises within the State. We hold that the legislature intended to exclude from tax the fuel oil which industrial concerns use in the business of fabricating merchandise which, when completed, would be subject to a sales tax and that a sales tax is intended to be imposed on railroads which are primarily engaged in commerce, that is, in trade rather than industry, or the fabrication of merchandise.

It is ordered that the determination of the Utah State Tax Commission be affirmed; but since the Tax Commission has been in error for many years, it is ordered that each party bear its own costs.

CROCKETT, C. J., and TUCKETT, JJ., concur.

CALLISTER, Justice (dissenting).

The majority opinion states that the issue of this case is whether a railroad is a commercial or an industrial enterprise; if it be industrial, it is exempt from sales

or use taxes on fuel oil bought or consumed in the propulsion of its engines.

This characterization is in effect an amendment of § 59–15–4[a] and [b], U.C.A. 1953, the relevant portions provide as follows:

"* * * The sale of coal, fuel oil and other fuels shall not be subject to the tax except as hereinafter provided.

\* \* \* \* \* \*

"[b] (2) To any person as defined in this act including municipal corporations for gas, electricity, heat, coal, fuel oil or other fuels sold or furnished for domestic or commercial consumption. * * *"

The statute clearly provides that fuel oil is exempt from the sales tax *except* that sold or furnished for *domestic* or *commercial* consumption. The majority opinion has interpreted the statute as providing that all fuel oil is subject to the sales tax *except* that sold or furnished for *industrial* consumption. This distinction is important because the majority opinion has arbitrarily determined that there are three basic types of consumers, domestic, commercial, and industrial, and all consumers *must* fit neatly within one of these categories.

This misconception that the statute provides for only three categories may have arisen from Union Portland Cement Co. v. State Tax Comm., 110 Utah 152, 157, 176 P.2d 879, 881 (1947), where on rehearing this court stated:

"In the case at bar an amendment to the Sales Tax Act became effective March 18, 1943, which, in effect, exempted sales of industrial coal from the sales tax. * * *"

However, at page 153 of the Utah Reports, page 880 of 176 P.2d, this court admonished:

"In this opinion and for the purposes of this opinion *only* we use the terms 'industrial coal' and 'coal for industrial use' as meaning 'coal other than sold or furnished for domestic or commercial consumption.'" [Emphasis mine.]

This opinion was never intended to be construed as meaning that if the consumption were not domestic or commercial, it must be industrial.

As observed by the majority opinion, the basic language for the Utah statute was obtained from a similar provision contained in Section 616(a) of the Federal Revenue Act of 1932. In an interpretation of the federal act in Wisconsin Electric Power Co. v. United States, 336 U.S. 176, 69 S.Ct. 492, 495, 93 L.Ed. 591, it was stated:

"The regulations interpret the section in line with the legislative history. U.S. Treas.Reg. 46 (1940 ed.) § 316.190 [as amended by T.D. 5099], presently applicable, provides in pertinent part:

"'Scope of tax.—The tax imposed by section 3411(a) of the Internal Revenue

Code, as amended, applies, except as provided hereinafter, to all electrical energy sold for domestic or commercial consumption and not for resale.

" 'The term "electrical energy sold for domestic or commercial consumption" does not include (1) electrical energy sold for industrial consumption, e. g., for use in manufacturing, mining, refining, shipbuilding, building construction, irrigation, etc., or (2) that sold *for other uses* which *likewise cannot be classed as domestic or commercial,* such as the electrical energy used by electric and gas companies, waterworks, telegraph, telephone, and radio communication companies, *railroads*, other similar common carriers, educational institutions not operated for private profit, churches, and charitable institutions in their operations as such. * *' " [Emphasis mine.]

This opinion clearly emphasizes that a use may be neither domestic nor commercial and yet not industrial. Nevertheless, if the consumption is not commercial or domestic, it is tax exempt.

This dissent is premised on the basis that if the consumption of fuel by the taxpayer is neither commercial nor domestic, the taxpayer is within the exempt status provided in § 59–15–4(a), U.C.A. 1953, and whether the use is industrial becomes irrelevant.

In State ex rel. Kansas City Power & Light Co. v. Smith, 342 Mo. 75, 111 S.W.2d 513, 515 (1932), a sales tax was imposed on the sales of electricity, sewer service, and gas to domestic, commercial, or industrial consumers. The court stated:

" * * * We therefore conclude that the Legislature did not intend to tax the sale of all electricity but, rather, to impose a tax only on the sale to 'domestic, commercial or industrial consumers,' each of which is distinct from the other, and, under the rule above announced, to exclude the sale of all electricity not coming within the meaning of these words."

The court concluded that the electricity sold to the taxpayer to propel its street cars, was used neither for industrial nor commercial purposes within the meaning of the act, and was therefore not subject to the tax.

In the instant case, the consumption of fuel by the taxpayer is neither domestic nor commercial and therefore falls within the exempt status. The fact that the consumption is not industrial does not alter its status.

The majority opinion has held that the legislature intended to exclude from taxation the fuel oil which industrial concerns use in the business of fabricating merchandise, which, when completed, would be subject to the sales tax, and that a sales tax is intended to be imposed on railroads which are primarily engaged in commerce, that is, in trade rather than in industry, or the fabrication of merchandise.

Section 59–15–4(a) provides for the levy of a tax upon every retail sale of tangible

personal property made within the State of Utah; it further provides that the sale of coal, fuel oil and other fuels shall not be subject to the tax except as hereinafter provided. The majority opinion renders this second provision superfluous and meaningless.

Section 59-15-2(e) defines a retail sale as "every sale within the state of Utah by a retailer or wholesaler to a user or consumer, except such sales as are defined as wholesale sales or otherwise exempted by the terms of this act," and a wholesale sale is deemed in § 59-15-2(f) "each purchase of tangible personal property or product made by a person engaged in the business of manufacturing, compounding for sale, profit or use, any article, substance or commodity, which enters into and becomes an ingredient or component part of the tangible personal property or product which he manufactures, or compounds."

From these definitions we may conclude that the sale of fuel oil would be a retail sale if made to a consumer, unless the sale were to a manufacturer, in which case it would be a wholesale sale and exempt from the sales tax. The legislature by the second provision of § 59-15-4(a) suspended the operation of these rules and provided a general exemption for fuel oil unless it was sold for commercial or domestic consumption. Therefore, we are compelled to conclude that the legislature intended to exclude a class of consumers of fuel oil who did not fit within the group defined by § 59-15-2(f) and yet were not domestic or commercial consumers. The appellant, taxpayer, is entitled to this exemption.

HENRIOD, Justice (dissenting).

I dissent. The main opinion seems to have decided this case by definition, pays lip service to a 22-year administrative interpretation as to what was a "commercial" or "industrial" operation, which the opinion says should be given great weight. It now says that the Tax Commission, although it was right for 22 years, is now right when it says it was wrong for 22 years.

I would like to ask how the main opinion and the Tax Commission could have arrived at the present conclusion in the 1860's, when the U. P. was subsidized by the U. S. Government to provide an "industrial" project to link not only a transcontinental rail system but the social, political and economic welfare of this country. I would like to ask whether all those Chinamen and Irishmen died in a "commercial" enterprise or an "industrial" project. Also, I would like to know whether, if the U. S. Government should take over the railroads in a rail-wage dispute (where rails are completely regulated as to the rate of profit they can make) the Government would have to pay the sales tax in this case because it was a "commercial" enterprise. Let's be practical, as the Tax Commission was for 22 years. The next step, I suppose, would be to de-

clare Auerbach's an "industrial" plant, immune from the tax.

The best argument against the main opinion's strained conclusion, is that when the interpretation of a tax statute has to be strained, it is to be strained in favor of the already overburdened taxpayer. In tax matters, in the last few decades the so-called "modern trend" has reversed the presumption of innocence to that of a presumption of guilt,—that the taxpayer is wrong and has the burden to prove he is right when a paternal sovereign points its finger at him. This isn't American. The case should be reversed.